# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 02-1336

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

WARREN G. GRIFFIN, JR.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 01 CR 30080—**William D. Stiehl**, *Judge.*

ARGUED SEPTEMBER 4, 2002—DECIDED NOVEMBER 19, 2002

Before FLAUM, *Chief Judge*, and CUDAHY and KANNE, *Circuit Judges*.

KANNE, *Circuit Judge.* A jury found defendant Warren G. Griffin, Jr. guilty of being a felon in possession of a firearm that had traveled in interstate commerce in violation of 18 U.S.C. § 922(g)(1). Griffin appeals, arguing (1) that the district court committed plain error in admitting improper rebuttal testimony; (2) that the evidence was insufficient to support his conviction; and (3) that the district court clearly erred in applying a two-level sentence enhancement for obstruction of justice. Because the evidence was sufficient and because we find no error either in the district court's decision to admit evidence

or in its application of the enhancement, we affirm both Griffin's conviction and his sentence.

## I. HISTORY

At 11:00 p.m. on June 12, 2000, in East St. Louis, Illinois, Detective Desmond Williams pulled over a blue four-door Pontiac Grand Am for speeding. He illuminated the car's interior by shining his car-mounted spotlight into the vehicle and saw that two men were inside. Approaching the car on the driver's side, Williams stopped at the car's center post and requested the driver's license and registration. While speaking with the driver, Darryl Russell, Williams saw that the car's front-seat passenger had the handle of a handgun protruding from the waistband of his pants. Drawing his own gun and ordering both the driver and passenger to keep their hands in the air and make no sudden movements, Williams reached inside the car from the back seat and tried to retrieve the gun from the passenger's waist. Before Williams could secure the gun, the passenger grabbed Williams's hand. A stand-off ensued, with Williams training his gun at the passenger's head, demanding that the passenger release his grip. The passenger refused, only letting go of Williams's hand as he opened the car door and fled. Instead of giving chase, Williams arrested Russell.

Williams conducted an investigation to identify the unknown passenger. He first searched the car and found a traffic ticket and a bond sheet issued to Griffin. By running the car's license plates, he determined Griffin had rented the car from a rental agency. Also, Williams recovered an envelope containing a set of photographs that had been recently developed by Griffin at a local supermarket. Examining the photos, Williams identified the passenger who had fled the scene as one of the individuals depicted. And after comparing that photo to a set

of mug shots at the station house, Williams identified Griffin as that passenger.

Russell gave a statement to police after the incident in which he claimed that someone named "James" or "Jaybo" was the passenger in the car who had the gun, not Griffin. According to Russell's statement, Jaybo had picked him up in Griffin's car that evening; Griffin was never in the car with Russell. When U.S. Deputy Marshal Sean Newlin arrested Griffin, Griffin corroborated Russell's story, claiming he had loaned the rental car to Jaybo that evening and had not been in the car with Russell when Williams pulled it over. According to Newlin, Griffin was adamant as to this last point stating, "I wasn't arrested by any skinny policeman." And although Griffin denied he was the passenger, Newlin reported that Griffin admitted to possessing guns while on supervised release. In the end, despite Griffin's and Russell's protestations of mistaken identity, Griffin was arrested and indicted with the charge of being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1).

Not surprisingly, Griffin presented an elaborate mistaken-identity and alibi defense at trial supported by his own testimony and that of five other defense witnesses, including Russell. But curiously, gone was the claim that Jaybo had been the gun-bearing passenger. Griffin and Russell admitted at trial that they had made up the Jaybo story, hoping to throw police off of Griffin's trail. Nevertheless, they continued to maintain that Griffin wasn't the passenger; they now claimed that the unknown individual was a minor named Issac Windom, also known as "Boo."

After being apprised of his Fifth Amendment rights, Boo testified that he was the passenger in the car. According to Boo, he was attending a friend's party when Russell drove up in Griffin's rental car. Although he did not know either Griffin or Russell (at trial, he was only able

to identify Russell as the driver by describing him as the man in the courtroom wearing an orange jumpsuit), he had heard from others that Russell was driving to Duck's Variety Store and, wanting to get something from the store himself, he decided to ride along. Boo testified that it was during this trip to the store that Williams pulled the car over. When Williams saw that he had a gun and tried to retrieve it, Boo ran.

Russell corroborated Boo's story, testifying that he had borrowed the rental car from Griffin at Duck's Variety Store earlier that evening. Russell was to return the car to Griffin at the store before it closed. Boo had hitched a ride with him back to the store, and on the way, Williams pulled the car over. On cross-examination, Russell admitted that he had lied in his statement to police and that he and Griffin had made up the Jaybo story.

Griffin, likewise, admitted at trial that he and Russell had manufactured the Jaybo story in an attempt to mislead the police. What had really happened, he testified, was that in the early evening of June 12, 2000, he had driven his rental car to Duck's Variety Store, where he was to meet Russell. He loaned the car to Russell for a joyride, requesting that Russell return the car later that evening. In the meantime, Griffin would walk around the store's neighborhood, visiting friends. But as he made his rounds, Griffin noticed that it was getting late and Russell had not yet returned. By 9:00 p.m., he decided to call another friend, Charles Gray, to give him a ride home. Gray picked him up around 10:00 p.m., and it took them about an hour to get to Griffin's home, arriving sometime around 11:00 p.m.

Gray testified that he had received a call from Griffin, who was calling from his cellular phone, sometime around 10:30 p.m. on the night of June 12, 2000. He remembered the time because he had been sitting at his computer

when his phone rang. Griffin wanted Gray to give him a ride home from Duck's Variety Store. Gray agreed. He estimated that the trip lasted between fifteen and twenty-five minutes.

To corroborate Gray's story, Griffin called both Gregory Parker, the owner of Duck's Variety Store, and Griffin's wife, Jocelyn. Parker testified that he had seen Griffin walk up to the store that evening and that Griffin had left sometime around 10:00 p.m. Jocelyn testified that she had been at home watching television on the night of June 12, 2000, and that Griffin returned home just as the previews of "In the Heat of the Night," were coming on at about 11:00 p.m. He did not have the rental car with him when he returned home.

The case was submitted, and the jury returned a guilty verdict, crediting the circumstantial evidence linking Griffin to the rental car and Williams's identification over the testimony of Griffin and his defense witnesses. At sentencing, the district court applied a two-level enhancement for obstruction of justice under the U.S. Sentencing Guideline Manual § 3C1.1 finding (i) that Griffin had initially lied to police by concocting the Jaybo story and (ii) that the evidence indicated he had committed perjury at trial. Griffin now appeals his conviction and sentence.

## II.  ANALYSIS

### A.  *Improper Rebuttal Testimony*

Griffin's first challenge on appeal—that the district court committed plain error in allowing U.S. Deputy Marshal Newlin to testify in rebuttal—is unsuccessful. Because Griffin failed to object to Newlin's testimony, we could only grant him a new trial if the district court committed a plain error that, if allowed to stand, would substantially impair the fairness and integrity of the judicial

process. *United States v. Noble*, 246 F.3d 946, 955 (7th Cir. 2001). Griffin does not explain how any asserted error in admitting this testimony could have had a substantial impact on the judicial process's fairness and integrity. This alone dooms his argument. *Cf. United States v. Alwan*, 279 F.3d 431, 439 (7th Cir. 2002). Moreover, we find no plain error in the district court's decision to allow Newlin's rebuttal testimony. The crux of Griffin's argument is that since he and Russell both admitted on their direct and cross-examinations that they had manufactured the Jaybo story, Newlin's rebuttal testimony that Griffin had told him, in essence, "Jaybo did it," was cumulative and improper. Griffin ignores that Newlin also testified that Griffin had made the gun-possession and "skinny police-man" statements—both of which, on cross-examination, Griffin had denied making. Thus, Newlin's testimony served to impeach Griffin—a proper subject of rebuttal. At worst, Newlin's rebuttal testimony included some cumulative evidence; that fact alone does not make the district court's decision to allow him to testify in the first place—without objection—plain error.

## B. *Sufficiency of Evidence*

Insufficient as well is Griffin's sufficiency-of-evidence challenge. At bottom, Griffin argues that since he and five other witnesses testified at trial that he was not the gun-bearing passenger in the car that evening, the jury—relying solely on Williams's questionable (as Griffin sees it) testimony and identification—could not have possibly found beyond a reasonable doubt that he was. Griffin mis-understands the role of an appellate court evaluating a sufficiency-of-evidence claim. We will overturn a guilty verdict only when the record contains no evidence, regard-less of how it is weighed, upon which a rational trier of fact could find guilt beyond a reasonable doubt. *United*

*States v. Richardson*, 208 F.3d 626, 631 (7th Cir.), *cert. denied*, 531 U.S. 910 (2000); *United States v. Griffin*, 150 F.3d 778, 784 (7th Cir. 1998). We do not weigh the evidence or reassess the credibility of the witnesses. *Id.* at 784-85. Yet, this appears to be what Griffin argues we should do. Griffin attacks Williams's identification arguing that his perception and judgment were impaired by the circumstances. Undeniably, at the time he observed the passenger in the car, it was dark and Williams was in a tense, stressful situation. Nevertheless, Williams testified that he had illuminated the vehicle with his car-mounted spotlight and that he had as long as three minutes in which to observe the passenger, at times coming nose-to-nose with him. This explanation provided the jury sufficient basis to credit Williams's identification. Although Griffin's attacks on Williams's perception would have been proper material for his closing argument, they do not form the proper basis of an appeal.

Contradicting Williams's testimony was that of six witnesses who stated that it was not Griffin but Boo who was the passenger. Six against one, Griffin argues, means that the evidence was overwhelmingly in his favor and, thus, the jury could not have reasonably found him guilty. But there can be no doubt by its verdict that the jury found Griffin's own witnesses' testimony fraught with inconsistencies, laden with bias, and, in the end, not credible. For example, Parker testified he had seen Griffin walk to Duck's Variety Store that evening; Griffin said he drove up. Gray said he received a call from Griffin at 10:30 p.m. to pick him up at Duck's and that the ride to Griffin's house took at most twenty-five minutes; Griffin said he called Gray at 10:00 p.m. and that the ride took an hour. Moreover, the witnesses were able to recall specific dates and times to relate Griffin's alibi, but unable to reconstruct other supporting details. And Griffin's alibi witnesses all admitted to having known or having had

close relationships with him. All of these facts were, as Griffin admits, effectively elicited through the government's cross-examinations. But even more damaging were Griffin's and Russell's admissions that they had previously lied to police about the passenger's identity; it is not surprising in light of that revelation that the jury chose to disbelieve the new story they presented at trial. The jury's verdict stands.

## C. *Obstruction Enhancement*

Griffin's final argument is that the district court clearly erred in applying a two-level enhancement for obstruction of justice under § 3C1.1 of the sentencing guidelines. Griffin's argument is two-fold. First, he argues that the Jaybo story he told police cannot support the enhancement because the guidelines require materially false statements to police officers, not given under oath, to significantly obstruct or impede the official investigation before the enhancement applies. *See* U.S.S.G. § 3C1.1 cmt. n. 4(g) (2002). Since there was no evidence that Williams or anyone else expended any resources to investigate the Jaybo lead, Griffin argues that the enhancement was improper. Second, Griffin argues that the district court erred in awarding the enhancement on perjury grounds because it did not make a sufficiently specific finding of the factual predicates of perjury. Griffin objected to the enhancement at sentencing and, thus, we review the district court's factual determination that the enhancement applied for clear error. *See United States v. Messino*, 55 F.3d 1241, 1247 (7th Cir. 1995). Because the district court could have applied the enhancement on either ground, Griffin needs to succeed on both challenges in order for us to remand for resentencing.

Griffin wins his first argument. The application notes to § 3C1.1 plainly explain that making material false state-

ments, not under oath, to law-enforcement officers will only serve as a basis for an obstruction enhancement when those statements "*significantly obstruct*[ ] *or impede*[ ] the official investigation or prosecution." U.S.S.G. § 3C1.1 cmt. n. 4(g) (emphasis added). This language requires a causal relationship between the materially false statement given and a resulting impediment upon the instant investigation or prosecution. There is no argument that the Jaybo statement was immaterial, but without evidence that the official investigation was impeded in any manner—let alone significantly—the statement alone cannot support the obstruction enhancement. *Compare United States v. Barnett*, 939 F.2d 405, 407 (7th Cir. 1991) (obstruction enhancement not applicable in part because false statement did not cause investigators to expend additional resources), *with United States v. Francis*, 39 F.3d 803, 811 (7th Cir. 1994) (obstruction enhancement proper where defendant's retraction of information previously given about co-conspirators caused government to reinvestigate and reevaluate its case, thereby impeding its investigation and prosecution).

In response, the government notes that we have indicated elsewhere that § 3C1.1 is designed to avoid applying an obstruction increase for a mere "exculpatory no," where a defendant denies guilt or conceals his crimes during police questioning. *See*, *e.g.*, *United States. v. Ross*, 77 F.3d 1525, 1550 (7th Cir. 1996). Since Griffin's statement went beyond a mere denial of his involvement to craft out of whole cloth the identity of a fictional person in an attempt to mislead police, the government argues that the statement oversteps the boundaries of the exculpatory-no doctrine and therefore may support the enhancement. Certainly, Griffin's Jaybo statement exceeds the protection of the exculpatory-no doctrine. Be that as it may, the clear guidance from the guidelines suggests that even the most outlandish and creative lies to law-

enforcement officers, not given under oath, must have a detrimental effect upon their efforts to investigate or prosecute the instant offense before the enhancement can apply. This is not to say that, in an appropriate case, the elaborateness or intricacies of a manufactured story exceeding the boundaries of the exculpatory-no doctrine cannot demonstrate a resulting burden placed upon law-enforcement officials who expended resources to track down its false leads. But here, without proof that police expended any additional resources in their investigation because of the Jaybo story, basing the enhancement on that statement was improper.

This is, however, an empty victory for Griffin. Besides relying on the Jaybo lie to support the enhancement, the district court made the independent finding that Griffin had lied on the stand by "ma[king] up a scenario relative to the events." (R. 38 at 27:17-18.) Committing, suborning, or attempting to suborn perjury supports an obstruction enhancement. U.S.S.G. § 3C1.1 cmt. n. 4(b). For enhancement purposes, perjury is defined—as it is under the federal perjury statute—as willfully giving under oath, rather than as a result of confusion, mistake, or faulty memory, a materially false statement. *United States v. Dunnigan*, 507 U.S. 87, 94 (1993); *see also* 18 U.S.C. § 1621 (2002). An obstruction enhancement will be upheld on appeal so long as the district court made an independent finding of obstruction that encompasses all of perjury's factual predicates. *Dunnigan*, 507 U.S. at 95. Here, because the district court made the requisite independent finding of perjury encompassing all of its factual predicates, it properly applied the enhancement.

Griffin contends that the district court's perjury determination is deficient under *Dunnigan* because it fails to identify these factual predicates with the requisite specificity. Without this specificity, Griffin claims he does not know to what the district court was referring when

it found that he "ma[d]e up a scenario relative to the events." Was the district court relying on the Jaybo story? If so, he had testified truthfully at trial that the Jaybo story was a lie. Or, perhaps, was it merely pointing out the inconsistencies between his and other witnesses' testimony? In that case, those minor inconsistencies were immaterial and inadvertent: a likely product of confusion or mistake, not the willful material lies contemplated by the perjury statute.

But Griffin does not take into account the simplicity of his trial, which presented a single factual issue for the jury: whether or not he was the gun-bearing passenger. In arguing that he was not, Griffin did not merely deny that he was the gun-bearing passenger and put the government to its burden. He and other defense witnesses testified that Boo was the passenger and that he was elsewhere at the time of Russell's arrest. Griffin's decision to testify to this elaborate mistaken-identity and alibi defense (and present five other witnesses to testify to it as well) was not the result of confusion, mistake, or faulty memory. Nor was this the case contemplated by *Dunnigan* where a self-defense, lack-of-capacity, insanity, or duress defense could have been truthfully presented, yet nonetheless thought by the jury to be an insufficient excuse for criminal liability. *Id.*

No, here, all that was at issue was Griffin's presence in that car that evening. In the end, the jury believed that he was and therefore must have rejected his elaborate mistaken-identity and alibi defense as untruthful. But more importantly for sentencing purposes, the district court believed he lied, independently determining that the only defense Griffin presented at trial—the mistaken-identity and alibi story—was untruthful:

> [The enhancement] is also prefaced by the defendant's testimony at trial, and the defendant is allowed to

> have a trial and is allowed to testify, he is allowed to deny that he committed the crime or that he was present, whatever; but what he's not allowed to do is make up a scenario relative to the events. *And it's clear from the evidence* that this is what this defendant did.

(R. 38 at 27:12-18 (emphasis added).) Thus, the district court independently found all of the factual predicates for a finding of perjury: that under oath Griffin had given material false testimony by concocting the Boo story and his alibi, the whole purpose of which was to substantially affect the outcome of the case by obtaining a not-guilty verdict. *Accord United States v. Bonilla-Comacho*, 121 F.3d 287, 293 (7th Cir. 1997) (upholding obstruction enhancement where "[b]oth judge and jury found the government's version of the events to be the truth and, as a result, . . . that [the defendant] lied on the stand"). Indeed, the finding of the lower court that the Supreme Court upheld in *Dunnigan* was similar to, and no more specific than, the record we have here:

> The court finds that the defendant was untruthful at trial with respect to material matters in this case. [B]y virtue of her failure to give truthful testimony on material matters that were designed to substantially affect the outcome of the case, the court concludes that the false testimony at trial warrants an upward adjustment by two levels.

*Dunnigan*, 507 U.S. at 95 (alteration in original). Although the *Dunnigan* Court observed that it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding, it found the above-quoted determination sufficient because it encompassed all of perjury's factual predicates. *Id.*; *United States v. Kroledge*, 201 F.3d 900, 905 (7th Cir. 2000). Here, as in *Dunnigan*, the district court made the requisite finding.

As the Court in *Dunnigan* observed in rejecting the argument that the perjury enhancement may chill or interfere with a defendant's right to testify, "[t]he requirement of sworn testimony, backed by punishment for perjury, is as much a protection for the accused as it is a threat." *Dunnigan*, 507 U.S. at 97. While Griffin clearly had a right to put the government to its burden by denying the charges brought against him, he did not have the right to invent a story with hopes of impeding that burden.

## III. CONCLUSION

For the foregoing reasons, Griffin's conviction and sentence are AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*